UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| Plaintiff, | ) 12 C 7646 ) |
| vs. | ) Judge Feinerman ) ) |
| ST. ALEXIUS MEDICAL CENTER, | ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

The United States Equal Employment Opportunity Commission ("EEOC") filed this suit against St. Alexius Medical Center, alleging that it violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, by failing to accommodate Charging Party Joy Watanuki's disability and also by terminating her from her greeter position because of her disability. Doc. 1. Trial is set for December 1, 2014. Doc. 188. St. Alexius has moved for summary judgment. Doc. 189. The motion is denied.

**Background**

The following facts are stated as favorably to the EEOC, the non-movant, as the record and Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). In considering St. Alexius's summary judgment motion, the court must assume the truth of those facts but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Watanuki suffers from moyamoya disease, a progressive cerebrovascular disorder that affects her neurological functions and limits her learning and thinking. Doc. 199 at ¶ 2. In November 2007, as part of an evaluation conducted at the request of the Illinois Department of Human Services ("IDHS"), Dr. Randy Georgemiller found that Watanuki "showed difficulty

1

with sustained attention and inhibition" and that "her cognitive and physical problems [were] causing marked psychological distress and interfering with her everyday functioning." *Id*. at ¶ 23. At the same time, Dr. Georgemiller concluded that Watanuki had "average to high average" memory skills and "high average" intelligence, that her multi-tasking was "acceptable," and that she was "capable of competitive employment." Doc. 214 at ¶¶ 13-16. Based on Dr. Georgemiller's evaluation, IDHS concluded that Watanuki was capable of competitive employment and that an accommodation would allow her to fully function. Doc. 199 at ¶ 24; Doc. 214 at ¶ 10.

In February 2009, in conjunction with Watanuki's application for Social Security Disability Income ("SSDI") benefits, Dr. H.G. Frank, Watanuki's neurologist, made several certifications to RiverSource Life Insurance Company. Doc. 199 at ¶ 8. He certified that Watanuki was not "able to work," was "unable to do any type of employment where short term memory is needed," and would "never" recover sufficiently to perform her job duties, and also that her usual job could not be modified so that she could perform with her impairment. *Ibid*. Dr. Frank made similar representations to RiverSource in January and July 2010, indicating that Watanuki's cognitive limitations prevented her from working and that no alteration in her employment could accommodate for her limitations. *Id*. at ¶¶ 9-10. Notwithstanding his representations to RiverSource, Dr. Frank testified at his deposition in this case that Watanuki was capable of working for the right employer with the right training. Doc. 214 at ¶¶ 24, 27.

In July 2008 and January 2009, in conjunction with Watanuki's SSDI application, Dr. Arthur Skladman, her internist, certified that she had poor memory, difficulty thinking or concentrating, mood disturbances, time or place orientation, oddities of thought, perception, speech, or behavior, and obsessions or compulsions. Doc. 199 at ¶¶ 14, 17. Dr. Skladman also

certified that Watanuki had "[n]o useful ability to function" in several categories, including the ability to "[r]emember work-like procedures," to "[m]aintain attention for two-hour segment[s]," and to "[d]eal with normal work stress." *Id*. at ¶¶ 15, 18. Like Dr. Frank, however, Dr. Skladman expressed a more favorable view of Watanuki's abilities at his deposition in this case, testifying that she could have performed as a greeter. Doc. 214 at ¶ 29.

In her SSDI application, which she filed because she could no longer work as a nurse, *id*. at ¶ 34, Watanuki represented that she follows written instructions "poorly," "can't remember" oral instructions, and can pay attention only for "2-5 minutes." Doc. 199 at ¶ 27. Watanuki also represented that she was "a special needs learner [that] need[s] more training and orientation in the beginning." Doc. 214 at ¶ 36. In 2009, the SSA determined that Watanuki had the residual capacity to work part-time but not as a nurse, and concluded that she could not engage in substantial gainful employment as defined by the Social Security Act. Doc. 199 at ¶ 28; Doc. 214 at ¶ 35. After being awarded SSDI benefits, Watanuki preferred jobs where she would earn less than $980 per month in 2009 and $1,000 per month in 2010, as she could earn less than those thresholds and still retain her SSDI benefits. Doc. 214 at ¶ 67.

In August 2009, St. Alexius's Director of Volunteers and Guest Relations, Monica Eorgoff, hired Watanuki as a part-time greeter. Doc. 199 at ¶ 32. The position had "day surgery" and "lobby" components. Characterized as "stressful," the "day surgery" component required the greeter to direct patients and guests and to interact with physicians and nursing staff. *Id*. at ¶ 33. Rick Panunzio, who trained Watanuki in day surgery, observed that she was "flustered" and had "difficulty grasping the most simple aspects of the job," and he believed that further training would not improve her performance. *Id*. at ¶¶ 34-36. The "lobby component" of the greeter position required answering inquiries, directing foot traffic, ensuring that volunteers

3

were appropriately staffed, and calling codes during emergencies. *Id*. at ¶ 37. Eorgoff observed that Watanuki "fr[oze] like a deer in headlights," and determined that she required additional training. *Id*. at ¶¶ 40-41.

Other employees thought that Watanuki performed adequately. Marianne Nyberg, who trained Watanuki in the lobby component, thought that she understood her roles and performed them correctly. Doc. 214 at ¶¶ 37-38. Watanuki's supervisor at Alexian Brothers Medical Center, where Watanuki previously worked as a volunteer greeter with similar responsibilities, thought that Watanuki performed very well. *Id*. at ¶ 44.

In a November 2009 phone call, Watanuki's vocational counselor, Lisa Hendrickson, told Eorgoff about Watanuki's disability, asked for permission to shadow Watanuki, requested that St. Alexius provide Watanuki with written instructions regarding her responsibilities, and inquired if St. Alexius had other positions to which Watanuki could transfer. *Id*. at ¶¶ 47, 49. Eorgoff told Hendrickson that she felt "tricked" because she did not know Watanuki was disabled when she hired her. *Id*. at ¶ 3. Eorgoff also promised to provide Watanuki with written instructions. Doc. 199 at ¶ 51. However, Eorgoff provided Watanuki with specific written instructions on only one occasion; on that occasion, Watanuki failed to complete the task and could not explain her failure. *Id*. at ¶¶ 43-44.

Hendrickson and Watanuki asked St. Alexius if it could reduce her eight-hour-a-day schedule, which left her fatigued. Doc. 214 at ¶ 1. On November 1, 2009, Watanuki emailed Eorgoff asking whether any half-time jobs were available, but days later withdrew her request because she wanted to remain a greeter and thought that things would improve. Doc. 199 at ¶¶ 54-56. Although Watanuki withdrew that request, she never indicated an unwillingness to consider transferring to another position. Doc. 214 at ¶ 4. No one at St. Alexius considered

4

whether there were possible accommodations that would have allowed Watanuki to continue working or whether there were other positions appropriate for her. *Id*. at ¶¶ 7-8.

On February 1, 2010, Eorgoff gave Watanuki a six-month performance review and terminated her. Doc. 199 at ¶ 59. The review indicated that Watanuki failed to meet standards in several categories essential to the greeter position. *Id*. at ¶ 60. At the time, St. Alexius had several open positions, including a Food Services Technician I position. *Id*. at ¶ 70; Doc. 214 at ¶¶ 55-56.

After leaving St. Alexius, Watanuki certified to the SSA that she had stopped working because she "could not sustain the level of work" required by the greeter position and that the job was "too difficult for [her]," "the number of hours were too high," and "[her] cognitive functioning declined." Doc. 199 at ¶ 67. Watanuki has since worked as a cashier at the Christian Shop for just under two years and then as a Food Service Clerk at a Mariano's Fresh Market, a position that requires her to "give out free food" at the direction of her supervisors. *Id*. at ¶¶ 68-69; Doc. 214 at ¶ 45. At Mariano's, Watanuki also is responsible for food safety and sanitation, responding to customer requests, and assisting with food production, packaging, presentation, rotation, and replenishment. Doc. 214 at ¶ 46.

Dr. Christina Blodgett-Dycus, Watanuki's nueropsychologist, opined that written job instructions would compensate for Watanuki's cognitive limitations, but that her organizational deficiencies precluded her from writing her own instructions. *Id*. at ¶¶ 20-21. Dr. Blodgett-Dycus added that written instructions helped Watanuki at her job at the Kenneth Young Center, enabling her to complete tasks that she could not complete with only verbal instructions. *Id*. at ¶ 22. Dr. Blodgett-Dycus also noted that written instructions helped Watanuki operate as a cashier at the Christian Shop. *Id*. at ¶ 23.

**Discussion**

I.   **ADA Failure to Accommodate Claim**

The EEOC's failure to accommodate claim alleges that St. Alexius failed to reasonably accommodate Watanuki by, for example, giving her written instructions or placing her in another available position. "The ADA requires employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)). To succeed on a failure to accommodate claim, "(1) the [charging party] must be a qualified individual with a disability; (2) the employer must be aware of the [charging party's] disability; and (3) the employer must have failed to reasonably accommodate the disability." *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). "In conjunction with this third element, the ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008) (internal quotation marks and citations omitted). "To survive a motion for summary judgment [on a failure to accommodate claim], a plaintiff must present the court with evidence that, if believed by a trier of fact, would establish all three elements." *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 748 (7th Cir. 2011).

With respect to the first element, St. Alexius argues that the EEOC is estopped from contending that Watanuki was a qualified individual under the ADA due to her prior "successful application for [SSDI] benefits." Doc. 190 at 6-7. This argument is defeated by *Cleveland v. Policy Management System Corp.*, 526 U.S. 795 (1999), which rejected the argument that a

6

plaintiff is estopped from claiming that she was a qualified individual simply because she had applied for and received SSDI benefits. In so holding, the Court noted that the Social Security Act's definition of "disability," which requires that the applicant be unable "to engage in any substantial gainful activity," 42 U.S.C. § 423(d)(1)(A), does not perfectly synch up with the ADA's definition of "qualified individual," which is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," 42 U.S.C. § 12111(8). 526 U.S. at 801. The Court concluded that because having a "disability" under the Social Security Act is not necessarily inconsistent with being a "qualified individual" under the ADA, no "special legal presumption" precludes ADA suits by a plaintiff who previously received SSDI benefits. *Id.* at 803-05.

That said, a plaintiff who "declare[s] that she was totally disabled in her SSDI application, [and] then declare[s] that she was a qualified individual under the ADA, … must show that this apparent inconsistency can be resolved with reference to variance between the definitions of 'disability' contemplated by the ADA and SSDI." *Lee v. City of Salem*, 259 F.3d 667, 674 (7th Cir. 2001) (emphasis omitted). "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Ibid.* (internal quotation marks omitted). St. Alexius contends that there is no such explanation because Watanuki's SSDI application stated that she "cannot work at any job in the national economy." Doc. 199 at ¶ 27; Doc. 190 at 6-7.

The EEOC responds that the phrase "cannot work at any job in the national economy" is "a term of art in SSA parlance"; that phrase, says the EEOC, does not mean that Watanuki could

not work at any job, but rather that she could work only part-time and that "there [were] no jobs that exist[ed] in significant numbers in the national economy that [she] c[ould] perform." Doc. 202 at 14-15. The EEOC is right. Watanuki's SSDI application stated that she is "a special needs learner and need[s] more training and orientation in the beginning [of a job]," but that in "today's economy, most employers do not tolerate this and [she] find[s] [her]self unemployed." Doc. 214 at ¶ 36. Moreover, in awarding SSDI benefits to Watanuki, the SSA concluded not that she could not work at all, but only that "there are not a significant number of jogs in the national economy that [she] can perform, irrespective of age, education, or work experience." Doc. 200-2 at 25. Under these particular facts and circumstances, Watanuki's SSDI application is not fatally inconsistent with her ADA claim.

With respect to the first and third elements of the failure to accommodate claim, St. Alexius argues that no reasonable accommodation would have enabled Watanuki to complete the essential functions of the greeter position. Doc. 190 at 7-8. That issue cannot be resolved in St. Alexius's favor on summary judgment, as the EEOC has adduced evidence that would allow a reasonable factfinder to find that written instructions would have enabled Watanuki to perform those functions. Dr. Blodgett-Dycus testified that providing written job instructions is an effective compensatory strategy for Watanuki's cognitive limitations because they help her with memory and organization. Doc. 214 at ¶ 20. Moreover, the record contains evidence that written instructions allowed Watanuki to complete her tasks while working at the Kenneth Young Center and that they enabled her to "successfully perform[] her job" as a cashier at the Christian Shop after St. Alexius terminated her. *Id*. at ¶¶ 22-23.

St. Alexius responds that the EEOC has failed to "explain[] how written job instructions could have helped Watanuki perform the … greeter job's essential functions." Doc. 190 at 7.

This argument fails to persuade. The ADA regulations provide that an employee and employer must engage in an interactive process to identify the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3); *see Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). St. Alexius does not dispute that it failed to engage Watanuki in an interactive process. Doc. 215 at 12. This is significant, for although "an employer's failure to engage in the interactive process alone is not an independent basis for liability, it is actionable if it prevents identification of an appropriate accommodation for a qualified individual"; in those situations, the plaintiff "must show that a reasonable accommodation could be made that would enable her to carry out the essential functions of her job." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014) (internal quotation marks and citation omitted); *see also Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013). The EEOC's evidence satisfies this standard because, as noted above, it would permit a reasonable factfinder to conclude that Watanuki could perform her job with written instructions. It certainly is true that other record evidence would allow a reasonable factfinder to reach the opposite conclusion—to take just one of many examples, on the one occasion when Eorgoff provided her with written instructions, Watanuki still failed to perform the task at hand and could not explain why. But the presence of sufficient evidence on both sides of the question precludes summary judgment.

Finally, with respect to the third element of the failure to accommodate claim, St. Alexius argues that it did not have to transfer Watanuki to an open position. Transferring an employee to a vacant position is a reasonable accommodation if "the employee is otherwise qualified" for that position. *Jackson v. City of Chicago*, 414 F.3d 806, 812-13 (7th Cir. 2005). When St. Alexius determined that Watanuki could not work as a greeter, it had available a "Food Services

9

Technician I" position, whose essential functions "were putting the food on the trays, filling the patient orders, delivering the food to the rooms, establishing the supplies, … as well as some cashiering[,] … noting the temperature of the refrigerators[,] … reporting variances as well as the temperature of the foods to make sure that they are safe, [and] understanding the safety and sanitary needs of the department." Doc. 214 at ¶ 35.

The EEOC has adduced evidence sufficient to allow a reasonable factfinder to conclude that Watanuki was qualified for the Food Services Technician I position. Watanuki currently works in a similar position at Mariano's grocery store. *Id*. at ¶ 46 ("Watanuki is responsible for food safety and sanitation; responding to customer requests; assist[ing] with food production, packaging, presentation, rotation and replenishment"). Doctors who examined Watanuki opined that she had above-average intelligence, average memory skills, and acceptable multi-tasking ability, and that she understands verbal instructions. *Id*. at ¶¶ 13-19. And IDHS concluded that Watanuki was capable of competitive employment and that an accommodation would allow her to fully function. *Id*. at ¶ 10.

In opposing this conclusion, St. Alexius argues that Watanuki's current job at Mariano's is not similar to the Food Services Technician I position because "Watanuki testified that in her Mariano's job she gives out free food and her employer tells her what department to go to and that department tells her what food to give away." Doc. 214 at ¶ 46. Watanuki did testify at her deposition that she "give[s] out free food," Doc. 214-2 at 4, but she also submitted an affidavit, attached to which is a description of her job responsibilities at Mariano's, responsibilities that include assisting with product production, packaging, presentation, rotation, and replenishment; ensuring in-stock position of available product; and maintaining high cleanliness standards. Doc. 200-2 at 64. Although the general rule holds that a plaintiff cannot defeat summary judgment

with an affidavit that contradicts her deposition testimony, *see Harmon v. Gordon*, 712 F.3d 1044, 1051-52 (7th Cir. 2013), Watanuki's declaration does not contradict her deposition testimony, as she was not asked at her deposition whether "providing free food" was her *only* task at Mariano's.

St. Alexius also argues that the Food Services Technician I position would have required Watanuki to work more than twenty hours per week, which according to St. Alexius was the maximum that Watanuki could work while retaining her SSDI benefits. Doc. 190 at 10. However, Watanuki's SSDI benefits turned on how much she earned, not on her hours, and she could have worked 29.07 hours per week as a Food Services Technician I without losing her benefits. Doc. 214 at ¶¶ 67-68. St. Alexius suggests that the position required working thirty-three hours a week, Doc. 199 at ¶ 74, and for support it cites the affidavit of human resources employee Leann Kadlec, Doc. 191-7 at p. 21, ¶ 2. But Kadlec avers only that the man who eventually filled the position "worked an average of thirty three … hours per week," *id*. at p. 22, ¶ 14, not that the position *required* thirty-three hours per week. A reasonable factfinder therefore could conclude that Watanuki's disability could have been accommodated by transferring her to that open position.

## II. ADA Disparate Treatment Claim

The EEOC's disparate treatment claim alleges that St. Alexius fired Watanuki because of her disability. "Disparate treatment claims arise from language in the ADA prohibiting covered entities from 'limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee.'" *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) (quoting 42 U.S.C. § 12112(b)(1)). "As in other disparate treatment employment discrimination claims, a plaintiff may prove

11

discrimination in violation of the ADA using one of two methods. Under the so-called 'direct' method, the plaintiff may show either direct or circumstantial evidence that points to a conclusion that the employer acted as it did for illegal reasons. The alternative way to prove discrimination is the familiar burden-shifting *McDonnell Douglas* method." *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006) (citations omitted).

St. Alexius's initial brief addresses the *McDonnell Douglas* indirect method in detail, but devotes only this one sentence to the direct method: "The EEOC has no direct evidence that Eorgoff or any other SAMC manager harbored animus against disabled persons." Doc. 190 at 11. In so arguing, St. Alexius forgets that an ADA plaintiff can rely on both direct *and* circumstantial evidence under the direct method. As the Seventh Circuit has explained, the appropriate focus under the direct method "is not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks omitted); *see also Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("The plaintiff's task in opposing a motion for summary judgment is straightforward: he must produce enough evidence, whether direct or circumstantial, to permit the trier of fact to find that his employer took an adverse action against him because of his race.").

Although it is a close call, the EEOC has adduced barely enough evidence to satisfy its burden under the direct method. First, although Eorgoff told Hendrickson that she would provide Watanuki with written instructions, she actually provided Watanuki with only one note aside from the instructions given to all greeters. Doc. 199 at ¶ 43. Second, and more significantly, Eorgoff told Hendrickson that she felt that she had been tricked because nobody had told her that Watanuki had a disability before Eorgoff hired her. Doc. 214 at ¶ 3. Although

a reasonable jury could certainly find from the record as a whole that St. Alexius did not terminate Watanuki because of her disability, a jury reasonably could reach the opposite conclusion based on this evidence, which construed with all reasonable inferences in the EEOC's favor show that Eorgoff did not want to hire a person with a disability, that she was tricked into doing so with Watanuki, and that she intentionally failed to take reasonable steps (providing additional written instructions) that would have allowed Watanuki to succeed.

**Conclusion**

For the foregoing reasons, St. Alexius's summary judgment motion is denied. The disparate treatment claim and the failure to accommodate claim will proceed to trial.

October 6, 2014

United States District Judge